**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC., | |
| Plaintiff, | |
| vs. | Civil Action No. 1:22-cv-10656 |
| KATHRYN KOVALENKO, | |
| Defendant. | |

## COMPLAINT

Plaintiff Nuance Communications, Inc. ("Nuance" or "the Company"), by its undersigned attorneys, commences this action against defendant Kathryn Kovalenko ("Kovalenko" or "Defendant"), and alleges as follows:

## INTRODUCTION

1.      Nuance, a worldwide leader in speech and imaging solutions for businesses and individuals, including in the healthcare diagnostics industry, brings this action against Kovalenko, a former Director of Product Strategy at Nuance, to enjoin Kovalenko from violating her non-competition, non-solicitation, and confidentiality obligations in Nuance's favor. Kovalenko resigned from Nuance on November 22, 2021, effective January 28, 2022 (although she would later shorten her notice period). While Kovalenko informed her Nuance coworkers that she was planning on joining a non-competitor, Nuance has since learned that Kovalenko commenced employment with Sirona Medical, Inc. ("Sirona"), a direct competitor of Nuance.

2.      Kovalenko's competition with Nuance through her employment with Sirona is barred by her contractual obligation not to compete with Nuance for a period of one year following the termination of her employment with Nuance.

3.      Further, Kovalenko is barred from soliciting Nuance customers or employees for the one year period following the termination of her employment with Nuance.

4.      Finally, Kovalenko is barred from disclosing or using proprietary information that she gained while working at Nuance, which, if revealed to Nuance's competitors, will result in immeasurable and irreparable harm to Nuance.

5.      If Kovalenko is not enjoined from her unlawful conduct, Nuance will face grave and irreparable harm to its legitimate business interests.

## PARTIES

6.      Nuance is a Delaware corporation with its corporate headquarters and principal place of business located at 1 Wayside Road, Burlington, Massachusetts, 01803. Nuance is a leading provider of voice and language solutions for businesses and consumers around the world.

7.      Kovalenko is an individual who, upon information and belief, resides in Hollis, New Hampshire.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Kovalenko because she was employed by Nuance, a Massachusetts-based company, for over seven years and regularly conducted business in this jurisdiction. Kovalenko reported to Nuance employees based in the Burlington, Massachusetts office, and had Massachusetts-based employee who directly reported to her as well. Additionally, Kovelenko regularly traveled to the Burlington, Massachusetts office in connection with her responsibilities as a Nuance employee.

9.      This Court also has personal jurisdiction over Kovalenko because she expressly consented to personal jurisdiction in state and federal courts in Massachusetts in the Nuance Communications, Inc. Confidential Information, Inventions and Noncompetition Agreement (the

"Agreement"), from which this action arises. *See* Agreement, a true and correct copy of which is attached hereto as **Exhibit 1**, § 13. In fact, Kovalenko agreed that she "specifically consent[ed] to appear in the state and federal courts of the Commonwealth of Massachusetts and agree[d] that this Agreement as well as such other contact [she had] had with the Commonwealth of Massachusetts is sufficient to provide [her] with notice that the state or federal courts located in the Commonwealth of Massachusetts, will be the forum for any action, suit or proceeding arising out of [the] Agreement."

10.     This Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

11.     Venue is proper in this Court because Kovalenko has expressly consented that the exclusive venue and forum for any actions arising under the Agreement shall be the federal and state courts in the Commonwealth of Massachusetts (*see* **Exhibit 1**, § 13), because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district, and because all parties to this action are subject to personal jurisdiction in Massachusetts as set forth above.

## FACTS

**Nuance's Products and Services**

12.     Nuance is a worldwide leader in speech and imaging solutions for businesses and individuals. Nuance offers a number of industry-leading products and services in the healthcare industry, including clinical intelligence solutions, patient engagement solutions, diagnostic imaging solutions, and workflow solutions.

13.     Among Nuance's key offerings is a product called the Precision Imaging Network

("PIN"), which was previously known as AI Marketplace. PIN is an AI-powered cloud platform that uses AI algorithms to deliver patient-specific data and insights from diagnostic imaging into existing clinical and administrative workflows across the healthcare ecosystem to promote better patient care, lower costs, and enhance physician efficiency.

14.    Additionally, Nuance offers a suite of products under the name PowerScribe, including PowerScribe One, PowerScribe 360, PowerScribe Workflow Orchestration, PowerScribe Lung Cancer Screening, and PowerScribe Follow-up Manager (collectively, "PowerScribe" or the "PowerScribe Suite"). The PowerScribe Suite is a radiology workflow, reporting, and communications platform that allows radiologists to capture diagnostic interpretations promptly and share actionable information with patient care teams.

15.    While Nuance sells the PowerScribe Suite independently, the PowerScribe Suite is also one of three cloud-based technology pillars that supports PIN, and thus the PowerScribe Suite and PIN are inextricably linked. Accordingly, Nuance employees who are responsible for supporting PIN are required to be incredibly knowledgeable about the PowerScribe Suite, and vice versa.

16.    Until approximately June of 2021, the teams responsible for PIN and the other diagnostic products, including PowerScribe, were one fully-integrated team under one set of Nuance leaders that worked together on a daily basis.

17.    Even since those teams were formally split into separate groups in June of 2021, the PIN and PowerScribe teams consistently work together, given the complementary, integrated nature of the product suites, and there is constant interaction between the teams to share confidential information about those products. In fact, as noted above, Nuance's product managers are *required* to know confidential product information necessary to develop, manage, and promote

4

Nuance's suite of complementary products, including information about products that may not be directly within a specific product manager's responsibility. Thus, even those Nuance employees who are primarily responsible for PIN have in-depth confidential information related to PowerScribe as a part of their core responsibilities, and vice versa.

**Nuance's Confidential Information and Goodwill**

18.     Nuance's success rests in substantial part upon its development and ownership of certain trade secrets and other confidential, proprietary information. Nuance's confidential information includes, but is not limited to, Nuance's confidential sales and product development strategies, product roadmaps, information about customer and prospect relationships, product information, strategies for product integration into other platforms, project management protocols and processes, revenue forecasting processes, marketing strategies, customer needs, service histories and preferences, pricing, and margins, among other things.

19.     To gain a foothold with key customers, Nuance has spent years developing strategies to market itself to such customers, which work has continued to this day. Nuance has compiled highly targeted and confidential information that has given it a leg up in the industry, including non-public information regarding specific customer contacts and key stakeholders at the customers, what specific product functions customers need or prefer, what specific pressures certain customers or prospects are experiencing (financial and otherwise), which competitors are also vying for the business (which is not necessarily public), and more.

20.     Nuance has devoted substantial time, effort, money, and other resources to the development, acquisition, maintenance, and protection of its confidential information by, among other things, restricting access to such information and requiring employees to sign confidentiality agreements and other restrictive covenants. Indeed, all Nuance employees are required, as a

condition of their employment, to agree to confidentiality obligations.

21.     For example, all of Nuance's computers that are distributed to its employees are password protected and encrypted. Additionally, Nuance's confidential information is kept in secure repositories, to which only certain employees have access.

22.     Nuance's confidential information is valuable because it provides Nuance with a distinct competitive advantage, and given that the nature of the industry is highly competitive, with extremely narrow bands of competitors (particularly in the diagnostics space), the confidential information has independent economic value to Nuance because it is not known to others.

23.     Nuance uses restrictive covenants agreements to protect its legitimate business interests, including its confidential and trade secret information as well as its goodwill with its customers. Nuance would not provide its employees with access to such customer relationships or confidential information without their agreement to abide by these restrictive covenants.

**Kovalenko's Employment with Nuance**

24.     Kovalenko was first employed by Nuance for a brief period of time starting in 2010.

25.     In October 2014, Kovalenko was offered an opportunity to rejoin Nuance in the role of Senior Product Analyst (Product Manager), which she accepted. In that role, Kovalenko was responsible for executing Nuance's strategic direction for its PowerScribe suite of products. She was required to work closely with cross-functional teams to manage product requirements, author user-stories, analyze pricing data and support new product introductions.

26.     During her tenure with Nuance, Kovalenko was the key leader for several years on PowerScribe, and directly led the development of Nuance's next generation cloud version, PowerScribe One. In fact, she was the lead product manager for that product.

27.     Kovalenko was also responsible for translating Nuance's strategic direction into a

set of compelling feature requirements and actionable user stories for internal stakeholders; vetting requirements with Nuance customers and subject matter experts to ensure acceptance and success in the market; ensuring that product requirements incorporate cross-functional needs including marketability, deploy-ability, trainability, and supportability; representing the product management team in meetings; working daily with development and QA to ensure that Nuance's products were built to customers' acceptance; providing frequent communication on progress, and escalating any issues that could impact the budget, timeline, or strategic vision; communicating with cross-functional teams for the purpose of developing documentation and ing materials; and contributing to feature request management, enhancement prioritization, beta/pilot support, pricing, and sales collateral creation.

28.    Thus, for many years, Kovalenko specialized in supporting Nuance's PowerScribe suite of diagnostic products, and was considered Nuance's main expert on PowerScribe.

29.    Kovalenko received a number of promotions during her tenure with Nuance, as well as significant raises. At the time her Nuance employment ended, her base salary was over $200,000.

30.    In late spring of 2021, Nuance made the decision to split the teams for its PIN product and PowerScribe Suite products. This decision was announced in early summer of 2021. In connection with that decision, Kovalenko was moved to the PIN team, with the title Director of Product Strategy, AI Marketplace. In connection with that position, Kovalenko became primarily responsible for the PIN product (although as noted below, she continued to work with the broader diagnostics team and assisted in efforts to support PowerScribe).

31.    In that role, Kovalenko was responsible for overall product strategy for the PIN product, including forecasting product evolution in light of new technologies, partnerships,

competitors, and business models.

32.     However, notwithstanding that her job title might suggest her role was limited to PIN, she was also responsible for the teams that oversaw the Nuance software that manages the integration of imaging AI into Nuance's PowerScribe products.

33.     In other words, Kovalenko oversaw the Nuance team that managed how AI results would get sent into the workflow solutions for radiologists.

34.     Kovalenko was exposed to substantial confidential information in connection with this role, including but not limited to Nuance's marketing plans for products, insights into customer needs and customer feedback, confidential product roadmaps, pricing, and more.

35.     Kovalenko had substantial customer interaction as a Nuance employee, as she was responsible for translating customer needs to Nuance's research and development team to support better product functionality. Indeed, Kovalenko regularly met directly with customers (most often radiologists) to better understand how Nuance could improve its products and services.

36.     Kovalenko also regularly led Nuance's "voice of the customer" program with members of her team to learn from Nuance customers and help shape improvements in Nuance's products. Kovalenko thus had (and would still have) critical, in-depth knowledge of key Nuance clients' needs for next-gen reporting solutions, how imaging AI should be integrated into the radiology reporting workflow and worklist, and more. That information would be immensely helpful to a direct competitor.

37.     Likewise, Kovalenko regularly interacted with Nuance's marketing team, as she was required to assist in defining the value proposition for Nuance products within the Healthcare Diagnostics group.

38.     Kovalenko was also required to understand the technical aspects of how Nuance's

products affected the customer's business (for example, performance measurement, return on investment targets, and financial plan, including revenue forecasting and attainment). She was also intimately familiar with Nuance's product roadmap in diagnostics, which is information that is not known to Nuance competitors (and would give those competitors an unfair advantage).

39.     While Kovalenko was formally moved to the PIN team in June 2021 when it split from the PowerScribe team, she nonetheless continued to work very closely with the PowerScribe team on a frequent basis. Likewise, she continued to interact regularly with Nuance's radiologist customers (among others). Additionally, Kovalenko was still a Nuance employee when the Company began its current round of integrated PIN/PowerScribe planning with outside consultants.

40.     Kovalenko was intimately familiar with both PIN's and the PowerScribe Suite's strengths compared to competing products – and their weaknesses. Kovalenko was thus familiar with certain product features (and limitations) that would permit her to steer a competitor's offerings in a way that would potentially exploit confidential Nuance information and better position that competitor's products and services.

41.     Accordingly, Kovalenko has extensive knowledge about Nuance's diagnostic products, including the PIN product *and* its PowerScribe suite of products.

**Kovalenko's Non-Competition and Other Obligations To Nuance**

42.     On November 3, 2014, in connection with her rehire by Nuance and her new role as a Senior Product Analyst (Program Manager), and as an express condition thereof, Kovalenko executed the Agreement with Nuance.

43.     The Agreement contains a number of reasonable restrictive covenants designed to protect Nuance's legitimate business interests, including but not limited to its trade secrets,

confidential information, and customer goodwill.

44.    In Section 2 of the Agreement, Kovalenko agreed that during the course of her employment with Nuance, she would "have access to, be entrusted or become acquainted with various confidential, trade secret and/or proprietary information of Nuance and/or its current and proposed customers and business partners (all of which is hereinafter referred to as 'Confidential Business Information')." As examples of Confidential Business Information, the Agreement provided the following non-exclusive list:

> nonpublic information regarding (a) marketing strategies, programs, plans and methods; (b) pricing policies, product strategies, and methods of operation and other business methods; (c) customer lists, customer identification, customer prospects, prospective leads or target accounts, and other basic customer information; (d) technical data, specifications, designs, concepts, discoveries, improvements, product plans, research and development information, formulas, compilations, programs, methods, techniques, inventions, devices, systems, and techniques; (e) expansion plans, management policies and other business policies and strategies, (f) business forecasts, financial data, costs, sales and revenue reports, and any analyses not publicly disclosed; (g) employment lists, salary information and other information regarding employees, agents, representatives, consultants and independent contractors of Nuance; (h) computer programs and software, computer source code, integrated computer systems and data, and internal procedures and forms; (i) lists of Nuance's vendors and suppliers and terms of service contracts; and (j) other information which enables Nuance and/or its current and proposed customers and business partners to compete successfully.

45.    Kovalenko also agreed pursuant to Section 2:

> "a.    to use Confidential Business Information only in the performance of [her] duties for Nuance;
>
> b.    to hold and retain Confidential Business Information in confidence and trust for the benefit of Nuance; and
>
> c.    to use all reasonable precautions to assure that Confidential Business Information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after [her] employment with Nuance."

46.    In Section 6 of the Agreement, Kovalenko agreed not to "remove any Nuance property (tangible or intangible and including without limitation Confidential Business

Information) from Nuance premises without Nuance's express permission," and that upon termination of her employment with Nuance, she would "immediately return all Nuance property" unless she obtained Nuance's written permission to keep it.

47.     Section 7 of the Agreement provides certain post-termination obligations that Kovalenko owes to Nuance. Specifically, Kovalenko agreed per Section 7 that:

> an agreement not to disclose or use Nuance's Confidential Business Information or Nuance-Related Developments after [her] employment by Nuance ends would be inadequate, standing alone, to protect Nuance's legitimate business interests because some activities by a former employee who had held a position like [hers] would, by their nature, compromise such Confidential Business Information and Nuance-Related Developments as well as the goodwill and customer relationships that Nuance will pay [her] to develop for it during [her] employment by Nuance."

Kovalenko thus recognized that "activities that violate Nuance's rights in this regard, whether or not intentional, are likely to be undetectable by Nuance until it is too late to obtain any effective remedy, and that such activities will cause irreparable injury to Nuance," and thus "[t]o prevent this kind of irreparable harm," she agreed to certain restrictive covenants following her termination from Nuance.

48.     Specifically, in Section 7(a), Kovalenko agreed for one year following termination of her Nuance employment (the "Restricted Period") not to "provide services to a Competitor in any role or position (as an employee, consultant, or otherwise) that would involve Conflicting Business Activities."

49.     The Agreement defines "Competitor" as "an individual, corporation, other business entity or separately operated business unit of an entity that engages in a Competing Line of Business," and defines "Competing Line of Business" as "a business that involves a product or service offered or under development by anyone other than Nuance that would replace or compete with any product or service offered, to be offered, or under development by Nuance with which [Kovalenko] had involvement while employed by Nuance (unless Nuance is no longer engaged in

or planning to engage in that line of business)."

50.     The Agreement defines "Conflicting Business Activities" as "job duties or other business-related activities in the United States or in any other country where Nuance does business, if such job duties or business-related activities (i) are the same as or similar to the job duties or business-related activities in which [Kovalenko] participate[s] while employed by Nuance or (ii) otherwise could put Nuance's Confidential Business Information at risk."

51.     The Agreement also provides at Section 7(b) that during the Restricted Period, Kovalenko would not "(in person or through assistance to others) knowingly participate in soliciting or communicating with any customer of Nuance in pursuit of a Competing Line of Business if [she] either had business[-]related contact with that customer or received Confidential Business Information about that customer in the last two years of [her] employment at Nuance."

52.     Kovalenko also agree, per Section 7(c) and (d), that during the Restricted Period, she would not "(in person or through assistance to others) knowingly participate in soliciting or communicating with" Nuance employees, partners, or suppliers for the purposes of persuading or helping those parties to end or reduce their relationship with Nuance.

53.     Finally, Kovalenko agreed in Section 7 that the covenants contained therein were "expressly provided . . . to avoid any future misunderstanding and/or dispute between [Kovalenko] and Nuance regarding specific restrictions on [her] post-employment conduct." She further acknowledged that "these restrictions are reasonable, necessary and enforceable to protect Nuance's Confidential Business Information, Nuance-Related Developments, good will, and other legitimate business interests. Among other interests, this Agreement is intended to provide mutual understanding, certainty and predictability for both [Kovalenko] and Nuance regarding enforceable boundaries on [her] future conduct."

54.     In Section 8 of the Agreement, Kovalenko agreed that if she were take accept a position with a Nuance Competitor (as defined in the Agreement) during the Restricted Period, she would "promptly give written notice to Nuance and will provide Nuance with the information it needs about [her] new position to determine whether such position would likely lead to a violation of this Agreement . . . ."

55.     In Section 9, Kovalenko recognized that violation of her confidentiality, non-compete, or non-solicit obligations would "cause irreparable harm to Nuance, the full amount of which will be impossible to estimate or determine and which cannot be adequately compensated." She thus agreed that "Nuance will be entitled to a restraining order, preliminary and/or permanent injunction, or other equitable relief from any court of competent jurisdiction to enforce this Agreement in the event of an actual, potential or threatened breach" of those obligations.

56.     Kovalenko likewise agreed in Section 9 that if she violated the restrictions in Section 7, "the time period for such restrictions will be extended by one day for each day that [she is] to have violated them, up to a maximum extension equal to the time period originally prescribed for the restrictions."

57.     Kovalenko also agreed in Section 9 that Nuance would be entitled to recover its attorneys' fees and costs if it prevailed in any suit to enforce the Agreement.

58.     In Section 11 of the Agreement, Kovalenko agreed that her obligations thereunder "will continue in accordance with its express terms regardless of any changes in [her] title, position, duties, geographic location, salary, compensation or benefits or other terms and conditions of employment."

59.     Finally, in Section 13, Kovalenko agreed that the Agreement would be governed by Massachusetts law and that any suit to enforce the Agreement would be initiated *only* in the

82241303v.3

state or federal courts of the Commonwealth of Massachusetts, and that she was waiving any objection ("including objections regarding lack of personal jurisdiction and objection to the convenience of the forum") to venue or jurisdiction of any such suit in Massachusetts. She further "specifically consent[ed] to appear in the state and federal courts of the Commonwealth of Massachusetts and agree[d] that this Agreement as well as such other contact [she had] had with the Commonwealth of Massachusetts is sufficient to provide [her] with notice that the state or federal courts located in the Commonwealth of Massachusetts, will be the forum for any action, suit or proceeding arising out of this Agreement."

60.     In signing the Agreement, Kovalenko stated:

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.**

(emphasis in original).

61.     The foregoing covenants are reasonable and necessary to protect Nuance's legitimate business interests because the confidential information and customer relationships to which Kovalenko had access as a Nuance employee would be incredibly valuable to a competitor, and would provide such a competitor with an unfair competitive advantage in developing and/or marketing its competing products and services.

**Kovalenko's Resignation**

62.     In late November 2021, Kovalenko announced her resignation from Nuance. At the time she resigned, Kovalenko informed her colleagues that she would be joining a company called IQVIA, which she claimed – and Nuance agreed – was not a direct competitor.

63.     In fact, initially there were rumors that Kovalenko was joining a competitor, which she vociferously denied. Instead, Kovalenko told her colleagues that she wouldn't go to a

14

competitor, because it "doesn't feel right to compete against Nuance."

64. Nuance did not consider Kovalenko's anticipated employment with IQVIA to be competitive, and thus did not seek to prevent her from accepting this role.

65. Because it did not consider her employment with IQVIA to be a competitive threat, and given the wealth of knowledge Kovalenko had about Nuance products and strategy and her critical role with the Nuance team, Nuance asked Kovalenko to stay on for several weeks for a transition period to permit the rest of her team to get up to speed. Kovalenko agreed, and the parties settled on a January 28, 2022 termination date.

66. Had Nuance believed that Kovalenko would join a direct competitor within one year of her termination, it would not have permitted her to continue working for Nuance for several weeks. Instead, Nuance would have immediately cut off Kovalenko's access to its confidential systems and terminated her employment.

67. Kovalenko grew frustrated with the length of her transition period, and ultimately determined that her last day with the Company would be January 14, 2022. Despite this decision, and notwithstanding numerous requests from HR, Kovalenko refused to update her last day in Nuance's Workday system.

68. On or about March 24, 2022, Nuance discovered that despite her claims that she would be joining IQVIA and would not compete with Nuance, Kovalenko had begun working for Sirona.

69. Notably, despite her obligations under Section 8 of the Agreement, Kovalenko never advised Nuance of her intention of joining Sirona. On information and belief, Kovalenko hid this information in order to avoid Nuance learning of her violations of the Agreement.

**Sirona's Competitive Offerings**

70.     Sirona is a direct competitor of Nuance. Indeed, according to CB Insights, Nuance is considered to be one of Sirona's top competitors ("Sirona Medical's top competitors include Nuance, Visage, and Sectra," https://www.cbinsights.com/company/sirona-medical/competitors-partners, last visited April 22, 2022).

71.     Sirona touts its offerings as "addressing the needs of today's radiology practices with a novel cloud-based platform that unifies radiology IT applications – worklist, viewer and reporter – onto a single, streamlined Workspace. Sirona's radiology operating system (RadOS) puts radiologists in the driver's seat with AI-powered solutions that simplify their workflow and amplify their work product." *See* https://sironamedical.com/about-us/ (last visited April 22, 2022).

72.     Sirona offers a product called Sirona Workplace, "a cloud-native radiology operating system" that purports to "unify[]" all the disparate systems into one seamless experience," resulting in radiology workflows that are "streamlined and simplified." Sirona claims that "[w]ith a radiologist-centric user interface design, Sirona Workspace combines 3 disparate modules in one: a zero-footprint viewer, a universal worklist, and a voice recognition reporter." https://sironamedical.com/ (last visited April 22, 2022).

73.     Sirona's website also provides: "The current radiology IT stack is made up of multiple federated systems: PACS, RIS, EHR, etc. Radiologists must shoulder the cognitive burden of managing these disparate systems and keeping them aligned. Sirona believes an integrated user interface, designed around the radiologist, will lead to a better radiology workspace. Just like the driver of a car is able to focus on the road ahead without having to worry about the intricacies of the combustion engine, the goal of RadOS is to allow radiologists to focus on their own 'road ahead': patient, study and findings." https://sironamedical.com/rados/ (last

visited April 22, 2022).

74.     In November 2021, Sirona announced a partnership with RevealDX, a software developer focused on improving lung cancer outcomes. This partnership added a fourth component to Sirona's product – an AI function. In fact, Sirona's press release stated that the partnership "will enable RevealDx to integrate their CE-marked RevealAI-Lung algorithm into Sirona's unified radiology platform, Workspace, making it easier for radiologists to implement the AI model into practice." Sirona's founder and CEO, Cameron Andrews, stated:

> "We are excited to welcome our first AI partner, RevealDx, to our RadOS platform as we believe radiology IT systems need to be fundamentally re-architectured — unifying the worklist, viewer, reporter, and AI onto one system — for AI algorithms to provide optimal usability and performance for vendors and physicians alike . . . . With a modern platform, AI has the power to redefine the radiology work product. We look forward to partnering with other leading AI developers to create the novel tools and radiomics applications that will amplify the value of radiology."

*See* https://sironamedical.com/revealdx/ (last visited April 22, 2022).

75.     In February of this year, Sirona announced its acquisition of the AI capabilities of a company called Nines, including "Nines' clinical data pipeline, machine learning engines, AI-powered radiology workflow management and analytics tools, as well as two FDA-cleared medical devices." *See* https://www.hcinnovationgroup.com/imaging/news/21257501/sirona-medical-to-add-nines-aipowered-algorithms (last visited April 22, 2022). The FDA-cleared devices are "NinesMeasure, a lung nodule algorithm that leverages AI to accelerate the diagnoses of certain respiratory diseases, and NinesAI Emergent Triage, a set of AI-powered algorithms that triages time-critical, life-threatening indications of intracranial hemorrhage and mass effect." *Id.*

76.     Just two months ago, Andrews published a post on LinkedIn entitled "What the Nines Acquisition Means for Sirona and the Future of AI." *See* https://www.linkedin.com/pulse/what-nines-acquisition-means-sirona-future-ai-cameron-andrews/.

77.     In that post, Andrews wrote:

It's not that AI is dead or useless in healthcare, but rather that non-integrated AI or standalone AI is simply not viable.

This is what we at Sirona have long recognized: the current radiology IT infrastructure cannot support AI adoption (certainly not at scale). [ . . . ] The reality is that for AI to truly transform healthcare, it must power speciality-specific workflows in novel ways - it cannot avoid clinical workflows, it must become the very heart of them.

[ . . . ]

Over the past several years, the team here at Sirona has been hard at work re-architecting radiology IT from the ground up and building a cloud-native radiology operating system (RadOS) to solve the fragmented workflow challenge. This RadOS has already demonstrated the ease of integrating new AI algorithms as we accomplished with our RevealDx partnership and recently showcased at RSNA in 2021.

Certainly, part of the appeal of the Nines acquisition was to add their portfolio of FDA cleared medical devices, NinesAI and NinesMeasure, to the RadOS platform. But the real value is in their team's experience and expertise running a teleradiology business and building out the AI-powered workflow management tools to support a radiology practice. [ . . .] It was clear that Sirona and Nines held complementary pieces of the puzzle, and that by joining forces a more comprehensive solution could be delivered faster to the marketplace: a solution that amplifies the impact that both radiologists and AI vendors can have on downstream care by making it possible for all AI to be embedded deeply into the clinical workflow for the very first time.

*Id.* This describes a strategy and product that is *directly competitive* with what Nuance does – and, as set forth below, products that Kovalenko supported as a Nuance employee for years.

78.     While Sirona does not offer independent worklist or reporting solutions, it is nonetheless still a Nuance competitor. If a client were to buy a Sirona solution, they would likely not buy a similar Nuance product (whether it be a reporting solution, workflow solution, or PIN), because the client would get similar functionality from Sirona (although of course Nuance believes that its solutions are superior).

79.     Sirona's entire pitch and value proposition is that buying all of the disparate systems

separately – i.e. viewer, worklist, speech reporting, etc. – from multiple vendors is unnecessary and creates a suboptimal workflow. That is the specific "problem" that Sirona is trying to solve with its new integrated solution.

80.     Additionally, while there may be circumstances in which Sirona and Nuance could partner together, that does not mean that the companies do not compete in other circumstances. For example, Nuance already competes with multiple other companies that have an integrated viewer, reporting module, and worklist, even though Nuance partners with some of those companies in certain circumstances. In other words, it is not at all uncommon in this space that certain companies might partner together in some capacities but be direct competitors in others.

81.     Accordingly, Sirona's solutions compete directly with Nuance's PowerScribe products, including without limitation its PowerScribe Workflow Orchestration product, *and* Nuance's PIN product, as Sirona integrates AI models directly into its workflow – just like Nuance. The two companies overlap completely in products aimed at reporting solutions, workflow orchestration, and integration of third party AI into radiology workflow.

82.     All members of Nuance's PowerScribe and PIN groups – including Kovalenko – are aware of the competition between Sirona and Nuance. In other words, Sirona is a "Competitor" under the Agreement.

83.     Upon information and belief, Kovalenko will be providing services to Sirona that relate to its products and services that compete with Nuance products for which she had responsibility during her Nuance employment, including both the PowerScribe reporting functions and PIN. In other words, on information and belief, Kovalenko's role for Sirona will require her to engage in Conflicting Business Activities under the Agreement.

19

**Nuance's Attempts To Obtain Assurances From Kovalenko and Sirona**

84.     Kovalenko's apparent decision to join Sirona was very concerning to Nuance, given the competitive overlap between the two companies. As a result of these concerns, Nuance's counsel sent a cease and desist letter to Kovalenko on March 29, 2022, which was delivered via FedEx on March 30, 2022, informing her that accepting a role with Sirona would constitute a violation of her Agreement. A true and accurate copy of that correspondence is attached here as **Exhibit 2**. A copy of this letter was also sent to Sirona's CEO, Cameron Andrews.

85.     The cease and desist letter demanded a response (including reasonable assurances) from Kovalenko by April 5. Despite that demand, Kovalenko failed to respond in any way to Nuance's letter by that date. On April 8, 2022, Nuance sent another letter to Kovalenko (and a separate letter to Andrews), stressing the urgency of this matter and again demanding a prompt response.

86.     On April 10, 2022, Kovalenko responded briefly to Nuance's counsel by email, indicating that she was "taking the matter seriously" and seeking counsel.

87.     On April 12, 2022, counsel for Kovalenko finally emailed Nuance's counsel, advising that he was in the process of being retained, but stated that he would be unavailable the following week due to out-of-state travel plans through April 22. On April 12 and 15, counsel for Nuance pressed Kovalenko's counsel for a prompt response to its cease and desist letters.

88.     Finally, after close of business on April 15, 2022, Kovalenko's counsel provided a substantive response, attached here as **Exhibit 3**.

89.     This response was unsatisfactory to Nuance, as it provided no assurances that Kovalenko would abide by her restrictive covenants.

90.     Instead, Kovalenko's counsel stated that Kovalenko's "only area of employment at

Nuance since April of 2021" was dealing with "the AI Marketplace" (which as noted above, is the previous name used for PIN), and stated that "Sirona does not offer a marketplace for AI solutions" competitive to PIN. However, as described above, by its own statements on its website, Sirona is focused on integrating third party AI models into their radiology workflow, just like Nuance.

91.     Moreover, as set forth above, Kovalenko was heavily involved in radiology reporting and integration of AI results in Nuance's reporting module – both before and after her move to the PIN team.

92.     Kovalenko's attorney's letter also suggested – erroneously – that in moving to the PIN group, Kovalenko was "leaving the Diagnostics line of business and healthcare division completely." Yet again, this is completely untrue. PIN remains a part of the Nuance's diagnostics business, even if for business purposes it has been separated from the PowerScribe team. Indeed, the PIN landing page on the Nuance website is directly under the Company's diagnostics solutions: https://www.nuance.com/healthcare/diagnostics-solutions/precision-imaging-network.html.

93.     Likewise, the claim that the PIN group is separated from Nuance's healthcare group is untrue. The Nuance website's healthcare page references several products, *including PIN* (notably, under the "Diagnostics solutions" section):



*See* https://www.nuance.com/healthcare.html.

94.     On April 22, 2022, Nuance's counsel reached out again to Kovalenko's attorney seeking additional information regarding her role with Sirona (including her title and responsibilities for Sirona, as well as her start date), and whether she had ever been employed by IQVIA, as she had represented to Nuance upon her departure.

95.     As of the date of this filing, counsel for Kovalenko has not responded.

**Irreparable Harm To Nuance**

96.     The information that Kovalenko learned during her employment with Nuance and is likely to still remember is highly proprietary, and would assist Sirona in competing unfairly, as set forth herein.

97.     Given the companies' extreme overlap and head-to-head competition, as Kovalenko supports Sirona's products and services, Kovalenko will not be able, even despite her best efforts, to avoid drawing on her experience supporting Nuance's competitive products and

services, including using Nuance's confidential information, developed at great expense and over years.

98.     In light of the foregoing, Kovalenko's employment at Sirona represents a serious competitive threat to Nuance's legitimate business interests, including its customer goodwill.

99.     As set forth above, Nuance has sought information regarding Kovalenko's role with Sirona, to no avail. Nonetheless, on information and belief, Kovalenko is a VP of product management at Sirona. In that role, she will necessarily be heavily involved in all sorts of client discussions, even if she is not a salesperson negotiating specific commercial terms.

100.    Given the in-depth information Kovalenko had regarding Nuance's products (including both PIN and the PowerScribe Suite), customer needs, roadmap, pricing, and more, on information and belief, Kovalenko cannot perform her job for Sirona without drawing upon the confidential information developed by Nuance over the years. Kovalenko will be responsible for directly competitive products and necessarily seek to improve Sirona's offerings as they compete with Nuance's products.

101.    For example, by virtue of her Nuance employment, Kovalenko knows which customers Nuance does business with (and where such customers are in the life-cycle of contracting), which entities Nuance is seeking to do business with, and such additional information as identity of key decision-makers, customer preferences and challenges, pricing considerations, and more.

102.    Kovalenko was intimately involved with planning Nuance's next generation reporting solution and how to redefine radiology workflow through the use of AI, both within reporting solutions and also in the interaction between the viewer and reporting module. This is exactly what Sirona is focused on, and thus on information and belief, Kovalenko is working on

exactly the same workflows as Nuance.

103.     Finally, Kovalenko's surreptitious decision to join Sirona and hide that information from Nuance despite her contractual obligations, and her insistence that she would never join a competitor but was instead joining IQVIA, leads Nuance to believe that Kovalenko will not respect her restrictive covenants.

104.     Accordingly, Kovalenko's employment with Sirona violates the Agreement. Unless Kovalenko is enjoined from working in a competitive capacity at Sirona, Nuance will continue to face irreparable harm.

<u>**COUNT ONE**</u>
<u>**Breach Of Contract**</u>

105.     Nuance repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

106.     The Agreement entered into by Nuance and Kovalenko is a valid and binding agreement supported by adequate consideration.

107.     Nuance has performed its obligations under the Agreement.

108.     Under the terms of her Agreement, Kovalenko is precluded from providing competitive services to a Nuance competitor during the Restricted Period (which would be tolled for the period during which she violated her obligations).

109.     The Agreement also prohibits Kovalenko from using or disclosing Nuance's confidential information, other than in service of her role with Nuance.

110.     Through her decision to accept employment with Sirona, Kovalenko has breached the Agreement with Nuance. This breach will continue if Kovalenko is allowed to work for Sirona during the Restricted Period.

111.     Additionally, Kovalenko's role at Sirona will cause her to inevitably disclose

Nuance's confidential information in violation of the Agreement, even if she does not intend to do so.

112.    The terms of the Agreement are reasonable for the protection of Nuance's legitimate business interests. Kovalenko expressly acknowledged that the restrictions on competition are "reasonable, necessary and enforceable to protect Nuance's Confidential Business Information, Nuance-Related Developments, good will, and other legitimate business interests." *See* **Exhibit 1**, § 7.

113.    As a direct and proximate result of Kovalenko's breach of the Agreement with Nuance, Nuance will suffer irreparable harm, including damages in the form of disclosure of its confidential information. Nuance will also suffer damages from Kovalenko's employment with Sirona in violation of the Agreement in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Nuance prays as follows:

A.  That the Court enter judgment for Nuance on all counts in the Complaint.

B.  That the Court preliminarily and permanently enjoin Kovalenko:

    i.    For a period of one (1) year following the termination of her employment with Nuance, plus the amount of time that Kovalenko has been performing services for Sirona, from working for Sirona or any other Nuance competitor in a competitive role;

    ii.    For a period of one (1) year following the termination of her employment, from soliciting any Nuance client, customer, or employee;

    iii.    From retaining, using, disclosing, or disseminating to any third-party in any manner whatsoever, any of Nuance's confidential information.

82241303v.3

C.  That the Court order Kovalenko to immediately return any Nuance property still in her possession, custody, or control, and provide an accounting of any confidential information that she used or shared with any third party, including but not limited to Sirona;

D.  That Nuance be awarded actual, compensatory damages caused by Kovalenko's misconduct;

E.  That Nuance be awarded its reasonable attorneys' fees and costs; and

F.  That the Court award Nuance such other and further relief, both legal and equitable, as is warranted by the facts and the applicable law.

## JURY DEMAND

Nuance hereby demands a trial by jury on all count of the Complaint so triable.

Dated: May 2, 2022

Respectfully submitted,

NUANCE COMMUNICATIONS, INC.

By its attorneys,

*/s/ Dawn Mertineit*
Katherine E. Perrelli (BBO# 459820)
Dawn Mertineit (BBO# 669988)
Anthony LaPlaca (BBO# 709946)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone:     (617) 946-4800
Facsimile:      (617) 946-4801
kperrelli@seyfarth.com
dmertineit@seyfarth.com
alaplaca@seyfarth.com