**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

**NUANCE COMMUNICATIONS, INC.,**          )
                                          )
               **Plaintiff,**             )
                                          )
          **v.**                          )          **Case No. 22-cv-10656-DJC**
                                          )
**KATHRYN KOVALENKO,**                    )
                                          )
               **Defendant.**             )
_____ )

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                **June 29, 2022**

## I.      Introduction

Plaintiff Nuance Communications, Inc. ("Nuance") has filed this lawsuit against Defendant Kathryn Kovalenko ("Kovalenko"), a former Nuance employee, for breach of contract arising from Kovalenko's alleged violation of an employment agreement containing non-competition, non-solicitation and confidentiality obligations to Nuance.  D. 1.  Nuance has now moved for a temporary restraining order, D. 2, and a preliminary injunction, D. 29.  For the reasons stated below, the Court ALLOWS Nuance's motion for a preliminary injunction, D. 29, and DENIES as moot Nuance's motion for a temporary restraining order, D. 2.

## II.     Standard of Review

As to Nuance's motion for preliminary injunction, the Court must consider:  "[1] the movant's likelihood of success on the merits of its claims; [2] whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; [3] the balance of hardships as between the parties; and [4] the effect, if any, that an injunction (or the withholding of one) may have on the public interest."  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing

Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)).  "Likelihood of success [on the merits] is the main bearing wall of [this] framework."  Ross-Simons, 102 F.3d at 16; Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009) (stating that whether the movant's claim likely will succeed on the merits "normally weighs heaviest in the decisional scales").  Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown."  Gedeon v. City of Springfield, No. 16-cv-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42–43 (1st Cir. 2010)).

Preliminary injunctive relief is an "extraordinary and drastic remedy."  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).  The plaintiff "bears the burden of establishing that these four factors weigh in its favor."  Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted).

III.    **Factual Background**

The following facts are drawn from Nuance's complaint, D. 1, the affidavits submitted in support of the motion for a temporary restraining order, D. 4; D. 5; D. 6; D. 37; D. 41, the declarations submitted in support of Kovalenko's opposition, D. 21; D. 22; D. 44, and accompanying exhibits.

A.      **Applications in the Radiology Field**

Virtually all radiologists use five primary types of radiology information technology ("IT") applications:  worklist, diagnostic viewer, reporter, picture archiving communications systems,

and patient data portal.  D. 22 ¶ 4.  Relevant here, a "worklist" application lists the images (e.g., X-rays, CT scans or MRIs) to be selected, reviewed and interpreted by a radiologist during the workday.  Id. ¶ 5.  A "diagnostic viewer" application is the interface used to display and review a particular image.  Id.  A "reporter" application typically uses speech-to-text technology to convert a radiologist's oral findings made during review of an image to a text report for the patient.  Id.

B. **Nuance's Business**

Nuance is a worldwide leader in speech and imaging solutions that offers several industry-leading products and services in the healthcare industry, including in the radiology field, such as diagnostic imaging and workflow solutions.  D. 1 ¶¶ 12–14; D. 4 ¶¶ 3–5.

Nuance's key products include the "Precision Imaging Network" ("PIN"), a radiology cloud platform powered by artificial intelligence ("AI") that uses AI algorithms to deliver patient-specific data and insights from diagnostic imaging into existing clinical and administrative workflows across the healthcare ecosystem.  D. 1 ¶ 13; D. 4 ¶ 4.  PIN uses other parties' algorithms and "resells" them, as opposed to using algorithms developed by Nuance itself.  D. 21 ¶ 18; D. 22 ¶¶ 15, 18.  PIN was previously known as "AI Marketplace."  D. 1 ¶ 13; D. 4 ¶ 4.

Nuance also offers a suite of products under the name "PowerScribe," a radiology workflow, reporting and communications platform that allows radiologists to capture diagnostic interpretations and share actionable information with patient care teams.  D. 1 ¶ 14; D. 4 ¶ 5.  As Kovalenko declares, PowerScribe is, "at its core," a "reporter."   D. 21 ¶ 21 (describing PowerScribe as a "speech-to-text documentation product").

Nuance's business success depends in substantial part upon its development and ownership of certain trade secrets and confidential information, including confidential sales strategies, existing and prospective customer information, product information, strategies for product

integration, project management protocols and processes, revenue forecasting processes, customer needs, services histories and preferences, and pricing and profit margin information.  D. 1 ¶ 18; D. 4 ¶ 9.  Nuance has spent years developing strategies to market itself to key customers, including compiling targeted, non-public, confidential information, such as information regarding specific customer contacts and key stakeholders at each customer, pressures experienced by certain customers or prospects, and which competitors are vying for business.  D. 1 ¶ 19; D. 4 ¶ 10.  Nuance has also invested significant resources to developing, acquiring, maintaining and protecting its confidential information, including by restricting access to such information and requiring employees to sign confidentiality agreements and other restrictive covenants.  D. 1 ¶ 20; D. 4 ¶ 11.

### C.     Sirona's Business

Sirona Medical, Inc. ("Sirona"), Kovalenko's new employer, is a development-stage company that develops products and services intended to streamline radiology workflows using a cloud-based platform.  D. 1 ¶ 71; D. 4 ¶ 17; D. 22 ¶¶ 4, 6.  Like Nuance, Sirona's radiology operating system ("RadOS") aims to "address[] the needs of today's radiology practices with a novel cloud-based platform that unifies radiology IT applications—worklist, viewer and reporter—onto a single, streamlined Workspace."  D. 1 ¶¶ 71–72 (quoting Sirona's website, which states that RadOS provides radiologists with "AI-powered solutions that simplify their workflow and amplify their work product"); D. 4 ¶¶ 17–18 (same); see D. 22 ¶ 7.  RadOS purports to "unify[]" all the disparate systems into one seamless experience, resulting in radiology workflows that are "streamlined and simplified."  D. 1 ¶ 72; D. 4 ¶ 18.  Sirona claims that, "[w]ith a radiologist-centric user interface design, Sirona Workspace combines [three] disparate modules in one:  a zero-footprint viewer, a universal worklist, and a voice recognition reporter."  D. 1 ¶ 72;

D. 4 ¶ 18.  Although Kovalenko does not identify Sirona as a competitor of Nuance, see D. 21

¶ 20, CB Insights, a third-party analyst, lists Nuance as one of Sirona's "top competitors," D. 1

¶ 70; D. 4 ¶ 15.

As Cameron Andrews ("Andrews"), Sirona's founder and chief executive officer, declares,

Sirona does not develop its own reporter software but rather licenses such application from a third

party.  D. 22 ¶ 13.  For example, Sirona has approached Nuance about using its reporter technology

as the speech-to-text foundation of Sirona's product.  Id.  Andrews declares that "Sirona has no

intention of competing with Nuance's speech-to-text product" as its "focus is on an entirely new

software architecture for integrating commonly used radiology IT applications."  Id. ¶ 14 (stating

that "[a]t no time has Sirona ever sold (or priced) reporting or worklist capabilities separately").

In addition to developing a viewer, Sirona is developing its own AI-powered algorithms

for integration into radiology workflows.  Id. ¶ 16.  In November 2021, Sirona announced a

partnership with RevealDX, a software developer focused on improving lung cancer outcomes.

D. 1 ¶ 74; D. 4 ¶ 20.  The partnership seeks to enable Sirona to integrate RevealDX's AI algorithm

into Sirona's unified radiology program and allow radiologists more easily to implement the AI

model into practice.  D. 1 ¶ 74; D. 4 ¶ 20.  In February 2022, Sirona announced its acquisition of

the AI capabilities of a company called Nines, including Nines' clinical data pipeline, machine

learning engines, AI-powered radiology workflow management and analytics tools.  D. 1 ¶ 75;

D. 4 ¶ 21.  Sirona also acquired two of Nines' FDA-cleared medical devices:  "NinesMeasure, a

lung nodule algorithm that leverages AI to accelerate the diagnoses of certain respiratory diseases,

and NinesAI Emergent Triage, a set of AI-powered algorithms that triages time-critical, life-

threatening indications of intracranial hemorrhage and mass effect."  D. 1 ¶ 75; D. 4 ¶ 21.

Following the Nines acquisition, Sirona's founder and CEO, Cameron Andrews, shared a post on

LinkedIn describing Sirona's strategy of seeking "to solve the fragmented workflow challenge" by "integrating new AI algorithms," i.e., "making it possible for all AI to be embedded deeply into the clinical workflow for the very first time."  D. 1 ¶ 76–77; D. 4 ¶ 22–23.

### D.  Kovalenko's Employment at Nuance

In 2014, Nuance hired Kovalenko as a "Senior Product Analyst (Product Manager)."  D. 1 ¶ 25; D. 4 ¶ 31; D. 5 ¶ 3.  In that role, she became Nuance's leading expert on PowerScribe and was responsible for executing PowerScribe's strategic direction.  See D. 1 ¶¶ 25–28; D. 4 ¶¶ 31–34; D. 21-1 at 2 (describing Kovalenko's role in an internal announcement email as being "focused on translating strategic roadmap direction for the PowerScribe . . . platform into a set of actionable user stories and compelling feature requirements for engineering and other internal stakeholders").  Kovalenko, for instance, led the development of the next-generation cloud version of PowerScribe.  D. 1 ¶ 26; D. 4 ¶ 33.  Nuance later promoted Kovalenko several times within Nuance's reporting line of business during her tenure with the company.  D. 21 ¶ 31.

Until mid-2021, Nuance's teams responsible for PIN and the other diagnostic products, including PowerScribe, operated as a single group under one set of leaders.  D. 4 ¶ 7.  In mid-2021, Nuance split its PIN and PowerScribe teams and moved Kovalenko from the integrated team working with both product lines to the PIN team as "Director of Product Strategy, AI Marketplace."  D. 1 ¶ 30; D. 4 ¶ 35; D. 5 ¶¶ 4–6.  In that role, Kovalenko was responsible for overall product strategy for PIN, as well as for the teams that oversaw the Nuance software that manages the integration of imaging AI into Nuance's PowerScribe products, i.e., how AI results would get sent into workflow solutions.  D. 1 ¶¶ 30–33; D. 4 ¶¶ 35–37.  Kovalenko's role exposed her to substantial confidential information, including Nuance's marketing plans for products, insights into customer needs and customer feedback, confidential product roadmaps and pricing

data.   D. 1 ¶ 34; D. 4 ¶ 38; see D. 1-1 § 2 (defining "Confidential Business Information" as "confidential, trade secret and/or proprietary information of Nuance and/or its current and proposed customers and business partners").   Kovalenko's role also involved substantial customer interaction and required that she meet with customers, most often radiologists, better to understand how Nuance could translate customer needs into improved products and services.   D. 1 ¶ 35; D. 4 ¶ 39.   As part of these responsibilities, Kovalenko led Nuance's "voice of the customer" program to learn from customers and shape product improvements.   D. 1 ¶ 36; D. 4 ¶ 40.   Kovalenko was required to understand technical aspects of how Nuance's products affected its customers' business, as well as Nuance's product roadmap in diagnostics.   D. 1 ¶ 38; D. 4 ¶ 42.   Kovalenko continued to work with the PowerScribe team and interact with Nuance's radiologist customers after her formal transition to the PIN team.   D. 1 ¶ 39; D. 4 ¶ 43.   As Director of Product Strategy, AI Marketplace, Kovalenko's salary was over $200,000.   D. 1 ¶ 29; D. 5 ¶ 6; D. 21 ¶ 32.

### E.    The Agreement

On November 3, 2014, as a condition of her employment at Nuance, Kovalenko signed a Confidential Information, Inventions and Noncompetition Agreement (the "Agreement").   D. 1 ¶ 42; D. 5 ¶ 7; see D. 1-1.   Kovalenko acknowledged that she would "have access to, be entrusted or become acquainted with" confidential information relating to Nuance's business and agreed to use such information only "in the performance of [her] duties for Nuance"  and not to disclose it. D. 1 ¶¶ 44–45; D. 1-1 § 2.

Kovalenko also acknowledged that agreeing not to use or disclose Nuance's confidential information after termination of her employment "would be inadequate, standing alone, to protect Nuance's legitimate business interests" and that "some activities . . . would, by their nature, compromise such [confidential information] as well as [Nuance's] goodwill and customer

relationships." D. 1 ¶ 47; D. 1-1 § 7. Kovalenko, therefore, agreed to certain post-termination obligations. See D. 1 ¶ 47; D. 1-1 § 7. Specifically, in Section 7(a), Kovalenko agreed for one year following termination of her employment with Nuance ("Restricted Period") not to "provide services to a Competitor in any role or position . . . that would involve Conflicting Business Activities." D. 1 ¶ 48; D. 1-1 § 7(a). The Agreement defines "Competitor" as "an individual, corporation, other business entity or separately operated business unit of an entity that engages in a Competing Line of Business," and defines "Competing Line of Business" as "a business that involves a product or service offered or under development . . . that would replace or compete with any product or service offered, to be offered, or under development by Nuance with which [Kovalenko] had involvement while employed by Nuance (unless Nuance is no longer engaged in or planning to engage in that line of business)." D. 1 ¶ 49; D. 1-1 § 7(e). The Agreement defines "Conflicting Business Activities" as "job duties or other business-related activities in the United States or in any other country where Nuance does business, if such job duties or business-related activities (i) are the same as or similar to the job duties or business-related activities in which [Kovalenko] participate[s] while employed by Nuance or (ii) otherwise could put Nuance's Confidential Business Information at risk." D. 1 ¶ 50; D. 1-1 § 7(e).

In Section 7(b), Kovalenko agreed that during the Restricted Period she would not "(in person or through assistance to others) knowingly participate in soliciting or communicating with any customer of Nuance in pursuit of a Competing Line of Business if [she] either had business[-]related contact with that customer or received Confidential Business Information about that customer in the last two years of [her] employment at Nuance." D. 1 ¶ 51; D. 1-1 § 7(b). Kovalenko also agreed, in Section 7(c) and (d), that during the Restricted Period she would not "(in person or through assistance to others) knowingly participate in soliciting or communicating

with" Nuance employees, partners, or suppliers for the purposes of persuading or helping those parties to end or reduce their relationship with Nuance.  D. 1 ¶ 52; D. 1-1 § 7(c)–(d).

### F.  <u>Kovalenko's Resignation from Nuance</u>

In late November 2021, Kovalenko announced her resignation from Nuance.  D. 1 ¶ 62; D. 4 ¶ 50.  At the time, Kovalenko planned to join a company called IQVIA.  D. 1 ¶ 62; D. 4 ¶ 50; D. 21 ¶ 43; D. 21-4 at 2.  Nuance did not consider IQVIA to be a direct competitor and so did not seek to prevent Kovalenko from accepting her new role.  D. 1 ¶ 64; D. 4 ¶ 52.  Instead, Nuance asked Kovalenko to remain at Nuance for several weeks as a transition period to which she agreed. D. 1 ¶ 65; D. 4 ¶ 53.  Kovalenko's last day with Nuance was January 14, 2022.  D. 1 ¶ 67; D. 4 ¶ 55; D. 5 ¶ 13.  In late March, Nuance discovered that Kovalenko had begun working for Sirona, which Nuance alleges to be a competitor.  D. 1 ¶ 68; D. 4 ¶ 56; <u>see</u> D. 3 at 4–6, 17.

## IV.   Procedural History

Nuance commenced this action on May 2, 2022, D. 1, and has moved for a temporary restraining order, D. 2, and a preliminary injunction, D. 29.  The Court heard the parties on May 26, 2022, D. 42, on the pending motions and took the matters under advisement.  D. 38.  The Court allowed post-hearing supplemental filings, D. 40, which have now been filed, D. 41, 44, and the Court has considered them along with the parties' other filings.

## V.   Discussion

### A.   <u>Likelihood of Success on the Merits</u>

#### 1.   *Massachusetts Law Applies*

As a preliminary matter, Kovalenko disputes that Massachusetts law applies here despite the provision in the Agreement stating that it does.  <u>See</u> D. 20 at 19.  As a general rule, Massachusetts courts reviewing a breach of contract claim will give effect to a choice-of-law

clause included in the contract.  Morris v. Watsco, Inc., 385 Mass. 672, 674 (1982).  Section 13 of

the Agreement provides that Massachusetts law governs.  D. 1 ¶ 59; D. 1-1 § 13.  Although

Kovalenko argues that she never lived in Massachusetts during her years-long tenure at Nuance,

D. 20 at 19, such is insufficient to show that application of Massachusetts law here would violate

public policy of a state with a "materially greater interest" than Massachusetts and which would

"be the state of the applicable law in the absence of an effective choice of law by the parties," as

she must to defeat the Agreement's choice-of-law provision.[1]  See Shipley Co. v. Clark, 728 F.

Supp. 818, 825 (D. Mass. 1990) (quoting Rest. (Second) of Conflict of Laws § 187(2)(b) (1971)).

Accordingly, Massachusetts law governs here.

### 2. The Agreement is Valid and Enforceable

Under Massachusetts law, "a restrictive covenant is only reasonable, and thus enforceable,

if it is (1) necessary to protect a legitimate business interest, (2) reasonably limited in time and

space, and (3) consonant with the public interest."  Automile Holdings, LLC v. McGovern, 483

Mass. 797, 808 (2020).

### a) Necessary to Protect a Legitimate Business Interest

In the employment context, legitimate business interests that may be protected by

restrictive covenants include trade secrets, confidential information and good will.  Id. at 810.

Here, Nuance argues the Agreement is necessary to protect all these interests.  D. 3 at 14–15; see

D. 1 ¶ 18–20 (describing how Nuance's business success relies upon significant investment in

developing, owning and maintaining trade secrets and other confidential information, including

---

[1] Kovalenko's argument that California law should govern fails.  See D. 20 at 19; D. 36 at 9–11.  While Kovalenko lived in either Connecticut or New Hampshire during her tenure at Nuance, D. 21 ¶ 27, Nuance is a Massachusetts-based company, D. 1 ¶ 6.  Nothing in the record reflects California having a materially greater interest than Massachusetts in this dispute.

strategic plans, product pricing data and revenue forecasts, and non-public information about customers and prospects); D. 4 ¶¶ 9–11 (same); see D. 1-1 § 7 (acknowledging that the Agreement's restrictive covenants "are reasonable, necessary and enforceable to protect Nuance's Confidential Business Information, . . . good will, and other legitimate business interests").

Kovalenko responds that Nuance has filed to identify any purported trade secret with specificity. D. 20 at 13–16. The cases Kovalenko cites in support of this argument, however, involve claims of trade secret misappropriation. See id. Kovalenko presents no authority to support that where, as here, a plaintiff asserts breach of contract as to a restrictive covenant, as opposed to a trade secret misappropriation claim, it must identify any purported trade secret with specificity. Moreover, Nuance has, at minimum, shown that the restrictive covenants at issue are designed to protect confidential information, which constitutes a legitimate business interest. The Agreement defines "Confidential Business Information" more broadly than trade secrets; i.e., defining it as "confidential, trade secret and/or proprietary information of Nuance and/or its current and proposed customers and business partners." D. 1-1 § 2. As Senior Product Analyst (Product Manager), Kovalenko was "primarily responsible for executing Nuance's strategic direction for its PowerScribe suite of products, and was considered Nuance's main expert on PowerScribe." D. 4 ¶ 31; see D. 1 ¶¶ 25–28. In her role as Director of Product Strategy, AI Marketplace, Kovalenko was exposed to "Nuance's marketing plans for products, insights into customer needs and customer feedback, confidential product roadmaps, pricing, and more." D. 1 ¶ 34; D. 4 ¶ 38. For example, Kovalenko's role required her "to understand the technical aspects of how Nuance's products affected [a] customer's business," i.e., "performance measurement, return on investment targets, and financial plan, including revenue forecasting and attainment." D. 1 ¶ 38; D. 4 ¶ 42. As part of these responsibilities, Kovalenko led Nuance's "voice of the customer" program to learn

from customers and shape product improvements.  D. 1 ¶ 36; D. 4 ¶ 40.  Such provided her with "critical, in-depth knowledge of key Nuance clients' needs for next-gen reporting solutions, how imaging AI should be integrated into the radiology reporting workflow and worklist, and more." D. 1 ¶ 36; D. 4 ¶ 40.

Further, although Kovalenko argues that she "has been and will be in no position to impact any goodwill of Nuance's in her work at Sirona" because Sirona currently has no "customers" and her job is not customer facing, D. 20 at 17, Kovalenko's mere "association with [a] competing product would be enough to raise doubts in the eyes of [Nuance's] customers as to the relative value of [Nuance's products]," given Kovalenko's substantial customer interaction while at Nuance.  See Marcam Corp. v. Orchard, 885 F. Supp. 294, 298 (D. Mass. 1995); D. 1 ¶ 35; D. 4 ¶ 39.

Accordingly, Nuance has sufficiently shown that the restrictive covenants at issue are necessary to protect a legitimate business interest.

> b)      Reasonably Limited in Time and Space

A restrictive covenant "must be no more restrictive than necessary."  Boulanger v. Dunkin' Donuts Inc., 442 Mass. 635, 643 (2004).  As to duration, Massachusetts courts consistently have held that restricted periods of one year are reasonable.  See, e.g., Nat'l Eng'g Serv. Corp. v. Grogan, No. 071583, 2008 WL 442349, at *5 (Mass. Super. Ct. Jan. 29, 2008); Advanced Cable Ties, Inc. v. Hewes, No. 061995B, 2006 WL 3292810, at *2 (Mass. Super. Ct. Oct. 19, 2006) (concluding that one-year period was "well within the umbrella of reasonableness for employment contracts").  Massachusetts courts have upheld significantly longer time restrictions.  See Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 229 (1975) (upholding three-year restriction on real estate salesman from engaging in real estate and brokerage business within defined area);

All Stainless, Inc. v. Colby, 364 Mass. 773, 779 (1974) (upholding two-year restriction on salesman of stainless-steel fasteners in New England and New York).   Thus, the Agreement's Restricted Period of one year, see D. 1 ¶ 48; D. 1-1 § 7, is reasonable in duration.

As to geographic scope, "[a] geographic restriction is reasonable as long as it restricts a former employee from doing business in an area in which the company itself conducts business." Marcam Corp., 885 F. Supp. at 299 (citing Kroeger v. Stop & Shop, 13 Mass. App. Ct. 310, 317 (1982)).   Here, while the Agreement does not specify any geographic limitation, Kovalenko's responsibilities at Nuance were not geographically limited, see generally D. 1; D. 4; D. 21; D. 22, as Nuance conducts business on a wide scale.   See D. 1 ¶ 12; see also D. 3 at 16 (stating that "Nuance conducts business throughout the United States and markets the PowerScribe [s]uite and PIN technology around the country").   Nationwide enforcement of the Agreement is, therefore, reasonable.   See Advanced Cable Ties, Inc. v. Hewes, No. 061995B, 2006 WL 3292810, at *2 (Mass. Super. Ct. Oct. 19, 2006) (concluding that lack of geographical limitation to future employment did not bar nationwide enforcement of restrictive covenant by national manufacturer); see also Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 439–40 (D. Mass. 2010) (concluding that nationwide geographic area was reasonable where plaintiff did business throughout the United States); Rentex, Inc. v. Franco, No. 1884CV01946, 2018 WL 4309330, at *4 (Mass. Super. Ct. July 16, 2018) (same); Anaqua, Inc. v. Bullard, No. SUCV201401491BLS1, 2014 WL 10542986, at *5 (Mass. Super. Ct. July 24, 2014), aff'd, 88 Mass. App. Ct. 1103 (2015) (stating that "[i]n the era of global commerce, a worldwide restriction is not necessarily unreasonable" (collecting cases)).

c)   Consonant with the Public Interest

"The public has an interest in the enforcement of valid contracts," Lombard Med. Techs.,

729 F. Supp. 2d at 443, including reasonable restrictive covenants in employment contracts, see Boulanger, 442 Mass. at 646 (rejecting that a covenant not to compete harmed the public interest in liberty of employment); see Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 245 (D. Mass. 2013), aff'd, 731 F.3d 6 (1st Cir. 2013) (noting that "[a]s a matter of long-standing Massachusetts case law, it is 'beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent'" (quoting New England Tree Expert Co. v. Russell, 306 Mass. 504, 508–09 (1940)). Here, the Agreement does not prevent Kovalenko from working but only from "provid[ing] services to a Competitor . . . that would involve Conflicting Business Activities." D. 1 ¶ 48; D. 1-1 § 7(a). Enforcement of such provision is consistent with the public interest.

### d)    Material Change in Employment Relationship

Kovalenko argues that her employment relationship with Nuance materially changed such that the Agreement did not remain valid and enforceable by the time of her resignation from Nuance in January 2022. D. 20 at 18–19. "It is well-settled under Massachusetts law that '[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed.'" Iron Mountain Info. Mgmt., Inc. v. Taddeo, 455 F. Supp. 2d 124, 132–33 (E.D.N.Y. 2006) (quoting Lycos, Inc. v. Jackson, No. 20043009, 2004 WL 2341335, at *3 (Mass. Super. Ct. Aug. 25, 2004)) (applying Massachusetts law). The Supreme Judicial Court articulated this principal in F. A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585 (1968), which concluded that a restrictive covenant was unenforceable because substantial changes to the defendant's rate of compensation and sales area indicated that the parties had "abandoned their old arrangement and had entered into a new relationship" rendering the previous restrictive covenant inapplicable. Id. at 587. The key issue in this regard is "whether the employment agreement had been 'mutually abandoned and

rescinded,'" which depends upon the intention of the parties. Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 16 (1st Cir. 2009) (quoting Intertek Testing Servs. NA, Inc. v. Curtis-Strauss LLC, No. 98903F, 2000 WL 1473126, at *6 (Mass. Super. Ct. Aug. 8, 2000)). In determining whether a material change occurred, courts consider whether the parties signed a new agreement and, if so, whether the agreement references the old agreement, whether there have been material changes in compensation, and whether the employee's job description and duties materially changed. See Iron Mountain, 455 F. Supp. 2d at 133–37; AFC Cable Sys. Inc. v. Clisham, 62 F. Supp. 2d 167, 173 (D. Mass. 1999).

Here, although Kovalenko's duties and compensation changed over her tenure at Nuance, there is no indication that the parties mutually abandoned and rescinded the Agreement due to Kovalenko's promotions, especially in light of the Agreement's provision stating that Kovalenko's obligations thereunder would "continue in accordance with its express terms regardless of any changes in [her] title, position, duties, geographic location, salary, compensation or benefits or other terms and conditions of employment." See D. 1 ¶ 58; D. 1-1 § 11; A.R.S. Servs., Inc. v. Morse, No. MICV201300910, 2013 WL 2152181, at *9 (Mass. Super. Ct. Apr. 5, 2013) (enforcing similar clause as evidence that "the parties understood that the [a]greement was intended to be enforceable notwithstanding a potential change in employment responsibilities"); see also Astro-Med, 591 F.3d at 16–17 (concluding that this doctrine did not apply where the employee's job change did "not reflect a mutual abandonment and rescission of the non-competition provision," there was no suggestion that the employer approached the employee with a new employment agreement, and there was no evidence of intent on the part of either party to revoke or superseded the employment agreement). Accordingly, the material change doctrine does not bar enforcement of the Agreement.

3.   *Nuance is Reasonable Likely to Succeed on Claim that Kovalenko Breached the Agreement as to the Non-Compete Provision*

a)   Non-Compete Provision

Nuance claims that Kovalenko has breached the Agreement's non-compete provision, D. 1-1 § 7(a), by accepting her employment at Sirona. See D. 3 at 17. As noted above, Kovalenko agreed for one year following termination of her employment with Nuance not to "provide services to a Competitor in any role or position . . . that would involve Conflicting Business Activities." D. 1 ¶ 48; D. 1-1 § 7(a). Thus, given the definitions provided under Section 7(e) of the Agreement, Nuance must make two showings: first, that Sirona is a "Competitor," i.e., that Sirona engages in a "Competing Line of Business," namely, "a business that involves a product or service offered or under development . . . that would replace or compete with any product or service offered, to be offered, or under development by Nuance with which [Kovalenko] had involvement while employed by Nuance"; and, second, that Kovalenko's work with Sirona would involve "Conflicting Business Activities," i.e., "job duties or other business-related activities" that "(i) are the same as or similar to the job duties or business-related activities in which [Kovalenko] participate[d] while employed by Nuance or (ii) otherwise could put Nuance's Confidential Business Information at risk." See D. 1 ¶¶ 48–50; D. 1-1 § 7(a), (e).

Nuance contends that Sirona competes with Nuance as to its PIN and PowerScribe products. D. 3 at 17. First, Nuance argues that Sirona seeks to address the needs of radiologists by integrating AI models into workflows "just like Nuance" does with PIN. Id. at 4–6 (arguing that the companies overlap "in products aimed at reporting solutions, workflow orchestration, and integration of AI into radiology workflow"). Kovalenko responds that Sirona is developing its own AI algorithm, while Nuance's "PIN" acts as an "AI Marketplace" for "resell[ing]" other developers' algorithms. D. 20 at 5, 7, 12; see D. 21 ¶ 18; D. 22 ¶ 15. Moreover, Kovalenko

submits that, during her time working on PIN/AI Marketplace—including as Nuance's Director of Product Strategy, AI Marketplace—Nuance viewed PIN's largest competitors as AI algorithm developers who were—or could become—"platform players," as well as makers of "neutral AI platforms," D. 21 ¶ 20 (citing examples).  According to Kovalenko, "Sirona was not considered" by Nuance to be "competitive in this field."  Id.  However, whether Nuance views Sirona as one of its "largest competitors" or even "competitive in this field" does not settle whether Sirona constitutes a "Competitor" under the Agreement.  Although Nuance does not develop its own AI algorithms, Nuance and Sirona's products both seek to integrate AI models into radiology practices to simplify workflows across the healthcare ecosystem.  See D. 4 ¶¶ 4, 17 see also D. 1 ¶¶ 74–77 (describing Sirona's efforts to expand AI capabilities); D. 4 ¶¶ 20–23 (same).  Thus, to the extent a customer purchases RadOS, Sirona's integrated radiology operating system, such would reduce the customer's incentive to purchase Nuance's PIN product—regardless of whether Nuance developed the underlying AI algorithms itself or licensed them from a third party.  See Life Image, Inc. v. Brown, No. SUCV201103764, 2011 WL 7443924, at *5 (Mass. Super. Ct. Dec. 22, 2011) (stating that an alleged competitor "does not need to manufacture identical products to be in direct competition with [plaintiff]; the customer will purchase either product, but not both" and concluding that former employee violated non-compete agreement where the firms at issue "compete[d] for the same customers").

Second, Nuance argues that PowerScribe competes with Sirona because Sirona's "entire . . . value proposition is that buying all of the disparate systems separately . . . from multiple vendors is unnecessary and creates a suboptimal workflow."  D. 4 ¶ 26.  Thus, according to Nuance, "[i]f a client were to buy a Sirona solution, they would likely not buy a similar Nuance product," since "the client would get similar functionality from Sirona."  Id. ¶ 25.  Kovalenko

submits that Sirona "does *not* develop its own speech-to-text recognition software as part of its product" but rather "licenses that application from a third party." D. 22 ¶ 13 (emphasis in original) (stating that "Sirona has on multiple occasions approached Nuance to try and use Nuance as the speech-to-text foundation of its product"). Further, according to Andrews, Sirona "has no intention of competing with Nuance's speech-to-text product, or to separately sell any particular workflow application used by radiologists" and instead is focused on developing a "new software architecture for integrating commonly used radiology IT applications." Id. ¶ 14. Such statements by Kovalenko and Andrews, however, fail to address Nuance's core argument that RadOS seeks to provide substantial overlapping functionality to Nuance's products, including PowerScribe. See, e.g., D. 4 ¶ 25; D. 36 at 3. As with PIN, to the extent a customer purchases RadOS, which includes reporting functionality, such would reduce the customer's incentive to purchase Nuance's PowerScribe product—regardless of whether Sirona developed the reporting functionality itself or licensed it from a third party.

Kovalenko does not deny that RadOS would offer the same reporting functionality as PowerScribe; instead, she offers evidence that diagnostic viewers with reporting capabilities are not thought to be competitive in the speech-to-text space. See D. 21 ¶ 24 (citing list compiled by independent third-party IT review organization of best reporting solutions as not including any viewers with reporting capabilities); see also id. ¶¶ 21–23 (stating that, according to Kovalenko's understanding, Nuance "has something like an 80% market share in this field, even though many current viewers in the marketplace also offer reporting capability," and that "viewer companies often have reporting capability, but radiologists nonetheless still use PowerScribe as a reporter for their needs"). Such argument, however, fails to detract from Nuance's allegations supporting that Sirona's product constitutes "a product or service offered or under development . . . that would

replace or compete with any product or service offered, to be offered, or under development by Nuance with which [Kovalenko] had involvement while employed by Nuance." See D. 1 ¶ 49; D. 1-1 § 7(e).  In other words, that Nuance enjoys a dominant market share for reporters does not mean that RadOS, which includes reporting functionality, would not compete with Nuance's reporting product.

As to whether Kovalenko's work with Sirona would involve "Conflicting Business Activities," Nuance argues that Kovalenko is "likely to utilize confidential technical, marketing, and customer information in her new job," given the overlap between the two companies.  D. 3 at 17–18.    Considering  the  above  analysis  regarding  the  companies'  overlapping  product functionalities, Nuance has satisfied its burden—for purposes of showing a reasonable likelihood of a breach of the non-compete provision—to show that Kovalenko's work with Sirona likely would  involve  "job  duties  or  other  business-related  activities"  that  "could  put  Nuance's Confidential Business Information at risk."  See D. 1 ¶ 50; D. 1-1 § 7(e); D. 21 ¶ 7 (declaring that Kovalenko's current title at Sirona is "VP, Product"); D. 37 ¶ 16 (stating that, "[b]ased on the declarations provided by Andrews and Kovalenko, it appears that [Kovalenko] is responsible for leading Sirona's product development team").[2]

_____

[2] Following the motion hearing, D. 38, Nuance submitted a job description for the role of "Vice President, Product" at Sirona—the same position Kovalenko now holds—that a Nuance employee received from a recruiter on LinkedIn in October 2021.  D. 41.  That document describes the role's general responsibilities as "working collaboratively to develop and ensure the successful execution of Sirona's product development roadmap," "lead[ing] the strategy for existing products and identify[ing] new product opportunities for [Sirona]."  Id. at 7–8.  It also listed specific responsibilities such as "ensuring effective cross-functional collaboration and strategy execution with Sales, Marketing, Customer Support, R&D, Quality/Regulatory, and Finance."  Id. at 8. Kovalenko and Andrews declare in response that the job description was drafted by the recruiter to capture as many qualified candidates as possible and, therefore, does not accurately capture what Kovalenko does in her role at Sirona.  See D. 44-1 at ¶¶ 1, 3; D. 44-3 at ¶ 3.  Further, according to Kovalenko and Andrews, Sirona has reorganized its leadership team since the description  was  drafted,  such  that  individuals  other  than  Kovalenko  handle  many  of  the

Accordingly, Nuance has shown a likelihood of success on the merits on its breach of contract claim as to the non-compete provision.[3]

### B.   Irreparable Harm

"To establish irreparable harm . . . a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business."   Ross-Simons, 102 F.3d at 18 (citing General Leaseways, Inc. v. National Truck Leasing Ass'n, 744 F.2d 588, 591 (7th Cir. 1984)).  "It is usually enough if the plaintiff shows that its legal remedies are inadequate."   Id.  "Massachusetts courts have generally recognized, in the context of restrictive covenants, that the 'task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one.'" Oxford Glob. Res., Inc. v. Guerriero, No. 03-cv-12078-DPW, 2003 WL 23112398, at *11 (D. Mass. Dec. 30, 2003) (quoting Kroeger, 13 Mass. App. Ct. at 322); see, e.g., New Eng. Circuit Sale v. Randall, No. 96-cv-10840, 1996 WL 1171929, at *1 (D. Mass. June 4, 1996) (stating that "it would be almost impossible to measure the plaintiff's damage if the defendant is allowed to go to work for a competitor").

---

responsibilities listed in the description. See id. ¶ 4; D. 44-3 ¶ 6.  Regardless of how accurately that document describes Kovalenko's specific responsibilities, Kovalenko and Andrews's arguments fail to rebut that Kovalenko's work with Sirona likely involves "Conflicting Business Activities" under the Agreement.   First, Kovalenko and Andrews do not deny that the job description reflects Kovalenko's general responsibilities as "VP, Product."   See generally D. 44. Second, while Kovalenko asserts that she has "described what [she] actually do[es] at Sirona to the Court," D. 44-1 ¶ 2 (emphasis omitted); D. 21 ¶ 7, such description, if anything, supports that Kovalenko's job at Sirona likely involves "job duties or other business-related activities" that "could put Nuance's Confidential Business Information at risk."   See D. 1 ¶ 50; D. 1-1 § 7(e); D. 21 ¶ 7 (stating that Kovalenko's role involves "work[ing] cross-functionally to ensure successful future launch of the Workspace solution, while identifying new products and opportunities for the company in the future").

[3] In light of this finding, the Court need not reach Nuance's other bases for the breach of contract claim (i.e., Kovalenko's alleged breaches of the non-solicitation and confidentiality provisions), D. 3 at 17-18.

Kovalenko argues that, because Sirona does not yet have "customers," and Kovalenko has not solicited any Nuance customers or used or disclosed any confidential information, Nuance cannot meet its burden to establish a danger of irreparable harm.  D. 20 at 17–18.  Even crediting Kovalenko's representation that she "has had no reason to do any of these things at Sirona, nor will she in the future," see id., given the extent of Kovalenko's experience at Nuance and the apparent similarity between her positions at Nuance and Sirona, see D. 37 ¶ 16, "it is difficult to conceive how all of the information stored in [Kovalenko]'s memory can be set aside as [s]he applies [her]self to a competitor's business and its products," see Marcam Corp., 885 F. Supp. at 297.  "On the contrary, what [Kovalenko] knows about [Nuance] is bound to influence what [s]he does for [Sirona], and to the extent it does, [Nuance] will be disadvantaged."  See id.; see also Aspect Software, 787 F. Supp. 2d at 127–130; Lombard Med. Techs., 729 F. Supp. 2d at 438–41.  Further, although Sirona does not yet sell its product to customers, such does not diminish the irreparable harm Nuance would suffer if Kovalenko were to use her substantial knowledge of Nuance's confidential information to in directing development of Sirona's competing products.  See, e.g., D. 4 ¶ 38 (describing Kovalenko's knowledge of Nuance's marketing plans, customer insights, confidential product roadmaps and pricing data).  Accordingly, Nuance has carried its burden of establishing a risk of irreparable harm absent preliminary injunctive relief.

### C.      **Balance of Hardships**

"Balancing harms requires the Court to weigh 'the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues.'"  Get In Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 203 (D. Mass. 2016) (quoting Ross-Simons, 102 F.3d at 15).  As concluded above, Nuance likely has suffered or will suffer irreparable harm based upon Kovalenko's alleged breach of the Agreement's non-compete provision.  By contrast, while

Kovalenko may experience some hardship if the Court prevents her from continuing to work at Sirona, such will not prevent her from working in a different industry or for an employer that does not provide products or services that compete with Nuance.  Indeed, Kovalenko's prior job offer from IQVIA confirms her employability at a non-competitor of Nuance.  See D. 4 ¶ 50; D. 21 ¶ 43. Further, to the extent that Kovalenko suffers from injunctive relief, "this harm is a predictable consequence" of her breach.  See Get In Shape, 167 F. Supp. 3d at 203 (citation omitted).

      **D.**     **Public Interest**

The public interest will be served through preliminary injunctive relief in this case.  As noted above, the public has an interest in the enforcement of reasonable restrictive covenants in employment contracts, see Lombard Med. Techs., 729 F. Supp. 2d at 443; Boulanger, 442 Mass. at 646.  Nuance seeks to enforce the Agreement, a valid, binding contract that is reasonable in scope and necessary to prevent irreparable harm to its business.

**VI.**    **Conclusion**

For the foregoing reasons, the Court ALLOWS Nuance's motion for a preliminary injunction, D. 29, and DENIES as moot Nuance's motion for a temporary restraining order, D. 2. The Court shall enter the order for preliminary injunction as proffered by Nuance, see D. 29-1. For the issuance of this injunctive relief, Nuance is required to post a bond pursuant to Fed. R. Civ. P. 65(c).  In the exercise of its discretion, the Court imposes a bond of $100,000.00.  The Court will issue the order of preliminary injunction after notice on the docket of the filing of the bond by Nuance.

      **So Ordered.**

                                    /s/ Denise J. Casper
                                    United States District Judge